MAY METROPOLITAN CORPORATION, Appellant, *v.* MAY OIL BURNER CORPORATION, Respondent.

Argued February 25, 1943; decided April 15, 1943.

*Louis Rivkin* for appellant.

*Walter G. Schelker, Jr.,* for respondent.

DESMOND, J.  Defendant has been granted judgment on the pleadings dismissing the complaint, and so we proceed to test for sufficiency the complaint and plaintiff's bill of particulars. The action is for breach of contract.  The first alleged cause of action grows out of the failure of the parties, in 1937, to conclude an agreement for the renewal for that year, of plaintiffs so-called " franchise " to deal in defendant's products (oil burning heating equipment) in Brooklyn.  At the time of the impasse between the parties in early 1937, plaintiff had served as such " Dealer " since early 1929, under eight successive annual " franchise " agreements, each of which contained some sort of clause looking to its renewal for the succeeding year. Plaintiff corporation was organized in 1929 " for the sole purpose of acting as a distributor of the defendant's products," was

forbidden by the "franchise" agreements to sell any other manufacturer's oil burners and is now completely out of business as a result of the failure of the parties in 1937 to get together on the question of plaintiff's "quota" for that year. For the first three years of the relationship between the parties the renewal clause was as follows: "Dealer shall have the privilege of renewing this agreement from year to year, provided he has lived up to all terms of his agreement. If the Company and the Dealer cannot agree as to the quota for subsequent years, a third party may be called in to decide what this quota shall be, with the understanding, however, that the quota shall not be for a lesser amount than previously contracted for from year to year." We are not informed as to whether an arbitrator's services were required during those years but the successive agreements show that the quota for the first year (1929) was 200 "units" and that the number of "units" actually agreed upon as plaintiff's quota for the years to which the above quoted form of renewal clause applied was as follows: 200 in 1930, 150 in 1931 and 200 in 1932. In renewing the relationship for 1932 a new form of contract was used which contained this clause: "Should the distributor carry out all of the terms of this agreement, particularly those in reference to paragraph marked ' Quota,' he shall automatically have the right of renewing this contract from year to year — providing he shall sign a new quota agreement for each year which shall be in excess of the previous year's quota and to be mutually agreed upon." This same language was in the agreements covering 1933, 1934, 1935 and 1936, also. The quotas in fact agreed upon for 1933, 1935 and 1936 were, respectively, 150, 150 and 100 (for some reason the papers in the case do not show the exact number of units agreed upon for 1934 but it is stipulated that the quota for that year was not more than 10 per cent higher than the 1933 quota of 150).

In January, 1937, the parties entered into discussions as to the quota to be named for that year. Plaintiff wrote defendant that plaintiff desired "a renewal of our present contract with an increased minimum quota from 100 oil burners to 150 oil burners," reminding defendant that this proposed increase was "substantially in excess of any prior increase in quota." Defendant insisted on an increase from 100 to 250. Plaintiff,

denouncing this demand as arbitrary and unreasonable, requested defendant to prepare a contract with a quota of 150. Defendant sent on a proposed " franchise agreement " which would have bound plaintiff to take 250 burners in 1937. When plaintiff refused to sign this, defendant, asserting that it was under no obligation at all to treat with plaintiff and noting its belief that there was " no agreeable mutual basis," informed plaintiff that there would be no renewal and that defendant would " make other arrangements as to representation in Brooklyn." The complaint alleges that " the provision for increase in quota as used in said contracts, was by the custom, usage and conduct of the. parties defined to contemplate an increase not in excess of 10% of the quota for the prior year," that the increase from 100 to 150 as proposed by plaintiff was within this contemplation and was reasonable but that the increase proposed by defendant (100 to 250) was unreasonable. All of this, alleges plaintiff, makes out a breach by defendant of plaintiff's right to renew for 1937 on reasonable terms. Plaintiff's prayer for judgment asks for an award to it of lost profits for 1937, and other items. The courts below, in ordering judgment for defendant on the pleadings, have written no opinions. We assume that they have held that the renewal clause is unenforceable, as being merely " an agreement to agree."

A contract is incomplete and unenforceable when, as to some essential term, there has been no agreement but only an agreement to agree in the future. (*St. Regis Paper Co.* v. *Hubbs & Hastings Paper Co.*, 235 N. Y. 30, *Sun Printing & Publishing Assn.* v. *Remington Paper & Power Co.*, 235 N. Y. 338.) In such cases the legal effect, or lack of effect, is the same as if the parties had left blanks in the writing, to be filled in later when their minds should meet. But a contract is not necessarily lacking in all effect merely because it expresses the idea that something is left to future agreement. If the contract contains, as to some material term, an " agreement to agree " and it fairly appears that what the parties intended was that the treaty should be binding only if the parties did thereafter in fact arrive at a mutually satisfactory agreement as to that term, then unless and until they arrive at that point, there is no contract. (*Mayer* v. *McCreery*, 119 N. Y. 434, 439.) Thus in the *St. Regis* case (*supra*), see 235 N. Y. at page 33, the

writing, after providing that for every three-month period after the first, the price was to be fixed " by mutual consent," went on to say that if the parties should fail to arrange a price for any such quarter-year, the contract should thereupon " terminate." The seller and buyer in that case decided for themselves, quite explicitly, just what should become of the contract if the future agreement should not materialize. There is in the agreements before us no statement that annual renewals are to be available to plaintiff only if the parties agree on a quota, nor any statement that, absent such agreement, the long-existing relationship shall forthwith be dissolved. Quite different is the scheme of these contracts. In eight successive annual agreements, the manufacturer here told the dealer that the dealer was thereafter to have the " privilege " or " right " of " renewing the agreement from year to year." From 1932 on, the dealer was told that it was " automatically " to have this " right of renewing." It does not seem possible that such strongly worded inducements meant only that, if and when defendant for its own reasons should decide to make other arrangements, defendant could seize upon the " mutually agreed upon " phrase with reference to quotas and call the whole thing off by arbitrarily demanding an increase of one hundred and fifty per cent in one year.

Plaintiff pleads in the complaint that the written words relating to renewal quotas came by usage and conduct to contemplate an annual increase of not more than ten per cent. None of the writings set out in the bill of particulars says anything about " ten per cent " but oral proof tending to show that such a meaning was arrived at by custom and usage would not necessarily be inadmissible as varying the writings. The increase offered by plaintiff for 1937 was an increase of fifty per cent. We think that plaintiff should have the opportunity of exploring before a jury the whole question of the meaning of this long series of writings and long course of dealings. We do not think that our search for the meaning of this renewal clause comes to a full stop as soon as the phrase " mutually agreed upon " is encountered. We still must deal with defendant's grant to plaintiff of " the right of renewing this contract from year to year," and we must deal with the word " automatically."

Reasonable men may well read all that language together as importing that defendant shall not impose, as a further condition for renewal, the consent of plaintiff to an unreasonable increase in quota. In other words, the contracts as written do not negative an implication of reasonableness and good faith. If proof is available from which a standard of reasonableness can be worked out, such proof should be taken. (*Stern* v. *Premier Shirt Corp.*, 260 N. Y. 201.) If such a standard or measure should develop out of the testimony on the trial, and a jury should hold that defendant's conduct was not up to the standard, there would, it seems, be no insuperable difficulty in arriving at damages to be " measured by the profits which plaintiff may be able to show with reasonable certainty were lost to him [it] by the breach." (*Stern* v. *Premier Shirt Corp., supra,* p. 205.)

All that we have so far said deals with the first alleged cause of action in the complaint, only. The second count describes another alleged breach of contract, by defendant. It says that the agreements for 1934, 1935 and 1936 required plaintiff to pay a certain sum toward defendant's advertising expense, and that " in return therefor defendant agreed to supply plaintiff with at least one-half of the names of all persons in Kings County, who made inquiries with respect to Quiet May Oil Burners." Plaintiff then goes on to allege, in this second cause of action, that it did its part by making its contribution for the advertising costs but that defendant failed and refused to submit to plaintiff the names of one-half the Kings county " prospects." This might sufficiently state a cause of action were we not under a duty of reading with it the allegations of plaintiff's bill of particulars. The written contracts contain plaintiff's promise to make the advertising payments, but say nothing about an engagement by defendant to furnish names to plaintiff. A letter from defendant to plaintiff, set out in the bill of particulars, makes it plain, we think, that there was no binding agreement by defendant to furnish to plaintiff the names of one-half those residents of Brooklyn who showed an interest in defendant's product. The letter is a mere statement that plaintiff may expect to get such names if it cooperates as to a number of other matters discussed in the letter. The letter negatives the idea of a binding agreement as to the furnishing of the names, and so the

second alleged cause of action, with the bill of particulars read into it, is insufficient.

The judgments in so far as they dismiss the first cause of action should be reversed and the motion to dismiss that cause of action denied; otherwise judgments affirmed, without costs.

LEHMAN, Ch. J., FINCH and RIPPEY, JJ., concur; LOUGHRAN, LEWIS and CONWAY, JJ., dissent and vote to affirm.

Judgment accordingly.